[Nos. A116707, A117353. First Dist., Div. Three. Nov. 7, 2008.]

ELIZABETH ANN CONTE, Plaintiff and Appellant, v.
WYETH, INC., et al., Defendants and Respondents.

COUNSEL

Law Office of Laurence O. Masson, Laurence O. Masson; Medical Legal Consultants of Washington, Ralph D. Pittle; Public Citizen Litigation Group, Brian S. Wolfman; Center for Constitutional Litigation and Valerie M. Nannery for Plaintiff and Appellant.

Gordon & Rees, Stuart M. Gordon, James R. Reilly, Fletcher C. Alford; Davis Graham & Stubbs and Jeffrey R. Pilkington for Defendant and Respondent Wyeth, Inc.

Hanson Bridgett Marcus Vlahos & Rudy, Merton A. Howard and Jill N. Cartwright for Defendant and Respondent Pliva, Inc.

Tucker Ellis & West, Michael C. Zellers, Peter E. Schnaitman, Richard A. Dean, Kristen L. Mayer and Jade T. Chao for Defendant and Respondent Purepac Pharmaceutical Co.

Goodwin Procter, Elizabeth F. Stone and Jonathan I. Price for Defendant and Respondent Teva Pharmaceuticals, Inc.

OPINION

**SIGGINS, J.**—Plaintiff Elizabeth Ann Conte developed a serious and irreversible neurological condition. She alleges her condition is due to her long-term consumption of a generic prescription drug, and that the warnings provided by the manufacturers of the drug failed to adequately warn of known dangers resulting from its long-term use. The trial court granted summary judgment in favor of all the manufacturers. Judgment was entered in favor of Wyeth, Inc. (Wyeth), the name-brand manufacturer of the drug, on two grounds: (1) Conte could not show that she or her physician relied upon warnings or product labeling disseminated by Wyeth; and (2) a name-brand pharmaceutical manufacturer owes no duty to individuals who take only generic versions of its product. The court granted summary judgment in favor of three generic manufacturers on grounds of federal preemption and Conte's lack of reliance on their warnings or product labeling.

We hold that the common law duty to use due care owed by a name-brand prescription drug manufacturer when providing product warnings extends not only to consumers of its own product, but also to those whose doctors foreseeably rely on the name-brand manufacturer's product information when prescribing a medication, even if the prescription is filled with the generic

version of the prescribed drug. We further conclude that Conte has shown there is a material factual dispute as to whether her doctor relied on Wyeth's product information, but that she is unable to show he relied on any information supplied by the generic manufacturer defendants. Accordingly, we reverse the judgment in favor of Wyeth and affirm the summary judgment in favor of each of the three generic manufacturers. In light of our disposition of this appeal, it is unnecessary for us to reach the generic defendants' further contention that federal law preempts state tort claims based upon allegedly inadequate drug labeling.

## BACKGROUND

The defendants in these consolidated appeals manufacture and market metoclopramide, which Conte's physician prescribed in its generic and name-brand form, Reglan, to treat her gastroesophageal reflux disease. Wyeth manufactures and markets Reglan. Defendants Purepac Pharmaceutical Company (Purepac), Teva Pharmaceutical USA, Inc. (Teva), and Pliva, Inc. (Pliva), manufacture generic versions of metoclopramide.

Conte developed tardive dyskinesia, a debilitating and incurable neurological disorder. She alleges she developed her condition as a result of taking metoclopramide for almost four years between August 2000 and April 2004. It is undisputed that Conte took only the generic version of the medication, not Reglan. She claims that defendants knew or should have known of a widespread tendency among physicians to misprescribe Reglan and generic metoclopramide for periods of 12 months or longer, even though the medication is only approved for 12 weeks of use, because the drug's labeling substantially understates the risks of serious side effects from extended use.

Her complaint, after various pretrial amendments, asserts claims for fraud, fraud by concealment and negligent misrepresentation[1] against Wyeth; negligence, strict products liability, negligence per se, and breach of express and implied warranties against the generic manufacturers; and medical negligence against her doctor, Robert Elsen, M.D. The crux of Conte's claims against all of the drug company defendants is that she was injuriously overexposed to metoclopramide due to their dissemination of false, misleading and/or incomplete warnings about the drug's side effects.

---

[1] Schwarz Pharma, Inc., is named as an additional defendant in the negligent misrepresentation claim. The complaint alleges Schwarz purchased the rights and liabilities associated with Reglan tablets and syrup from Wyeth in December 2001 pursuant to an asset purchase agreement that made Schwarz responsible for Reglan-related claims arising from and after March 31, 2002, subject to a right to indemnification by Wyeth up to an amount not known to Conte.

Purepac successfully moved for summary judgment on the ground that Conte's claims against it are preempted by the Federal Food, Drug, and Cosmetic Act (FDCA) (21 U.S.C. § 301 et seq.) and its implementing regulations. Pliva and Teva subsequently filed a joint motion for summary judgment on the same basis. While the Pliva/Teva motion was pending, Wyeth moved separately for summary judgment arguing its product information had no causal relationship to Conte's injuries and it owed her no duty of care. Unlike the generic manufacturers, it did not assert that Conte's claims were preempted by federal law. Pliva (but not Purepac or Teva) joined in Wyeth's motion asserting a lack of causation, and argued Conte could not prove any alleged inadequacies in its own labeling[2] caused her injuries because neither she nor her doctor relied on it.

The court granted Wyeth's motion on both grounds. The court found that neither Conte nor her doctor relied on drug information provided by Wyeth, and that as a name-brand manufacturer, Wyeth owes no duty of care to the users of generic versions of its name-brand drug. The court subsequently granted the Pliva/Teva summary judgment motion on the ground that Conte's state tort claims were preempted by federal law.

Conte timely appealed the judgments in favor of each company. We granted her unopposed motion to consolidate the appeals for purposes of briefing, oral argument, and decision.

## DISCUSSION

### I. *Summary Judgment Standards*

" 'To secure summary judgment, a moving defendant may prove an affirmative defense, disprove at least one essential element of the plaintiff's cause of action [citations] or show that an element of the cause of action cannot be established [citations]. [Citation.] The defendant "must show that under no possible hypothesis within the reasonable purview of the allegations of the complaint is there a material question of fact which requires examination by trial." [Citation.] [¶] The moving defendant bears the burden of proving the absence of any triable issue of material fact, even though the burden of proof as to a particular issue may be on the plaintiff at trial. [Citation.] . . . Once the moving party has met its burden, the opposing party bears the burden of presenting evidence that there is any triable issue of fact

---

[2] Labeling includes package inserts, which are the primary form of labeling for prescription drugs. (*Sykes v. Glaxo-SmithKline* (E.D.Pa. 2007) 484 F.Supp.2d 289, 308.)

as to any essential element of a cause of action.' " (*Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1485 [72 Cal.Rptr.2d 232].)

"In reviewing the propriety of a summary judgment, the appellate court must resolve all doubts in favor of the party opposing the judgment. [Citation.] The reviewing court conducts a de novo examination to see whether there are any genuine issues of material fact or whether the moving party is entitled to summary judgment as a matter of law." (*M.B. v. City of San Diego* (1991) 233 Cal.App.3d 699, 703–704 [284 Cal.Rptr. 555].) "We accept as true the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them. [Citation.] However, to defeat the motion for summary judgment, the plaintiff must show ' "specific facts," ' and cannot rely upon the allegations of the pleadings." (*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 805 [85 Cal.Rptr.2d 459].) "While '[s]ummary judgment is a drastic procedure, should be used with caution [citation] and should be granted only if there is no issue of triable fact' [citation], it is also true '[j]ustice requires that a defendant be as much entitled to be rid of an unmeritorious lawsuit as a plaintiff is entitled to maintain a good one.' [Citation.] 'A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail.' " (*M.B. v. City of San Diego, supra,* at p. 704.)

"We need not defer to the trial court and are not bound by the reasons for the summary judgment ruling; we review the ruling of the trial court, not its rationale." (*Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 85 [20 Cal.Rptr.3d 1].)

## II. *Relevant Federal Regulation*

■ Wyeth and the generic manufacturers market their respective metoclopramide products under the FDCA. Section 505 of the FDCA, title 21 United States Code section 355, forbids the distribution of any new drug unless an application has been approved by the federal Food and Drug Administration (FDA).

A name-brand manufacturer seeking to market a new prescription drug must submit a new drug application, supported by extensive studies of the drug's safety and effectiveness. (21 U.S.C. § 355(a)–(i); see *Colacicco v. Apotex, Inc.* (E.D.Pa. 2006) 432 F.Supp.2d 514, 522.) Approval of the new drug application will be denied if clinical testing data and other information do not show that the drug is safe and effective "for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof," or if "based on a fair evaluation of all material facts, such labeling is false or misleading in any particular." (21 U.S.C. § 355(d).)

The second type of marketing application considered by the FDA is the abbreviated new drug application. The abbreviated new drug application mechanism was established in 1984 by the Drug Price Competition and Patent Term Restoration Act of 1984 (Pub.L. No. 98-417, 98 Stat. 1585; the "Hatch-Waxman Amendments" to the FDCA) to reduce the time and cost required to obtain FDA approval for generic versions of approved drugs. (See *Colacicco v. Apotex, Inc., supra*, 432 F.Supp.2d at pp. 522–523.) Under the Hatch-Waxman Amendments, a generic manufacturer is not required to submit independent evidence of the drug's safety and efficacy. Instead, the generic manufacturer need only certify that the generic product is a bioequivalent of the name-brand drug and that the labeling and warnings for the generic drug are identical to those for the approved name-brand or "listed" drug.[3] (21 U.S.C. § 355(j)(2)(A).)

### III. *Wyeth's Motion: Causation, Reliance and Duty*

#### A. **Causation/Reliance**

Conte's claims against Wyeth are premised on misrepresentations in Wyeth's labeling of Reglan and in a monograph on Reglan it provided for the Physician's Desk Reference (PDR).[4] It is undisputed that Wyeth (or its predecessor in interest) prepared the PDR monograph on Reglan/metoclopramide, which is identical to the FDA-approved package insert. Wyeth contends the trial court correctly ruled that Conte cannot establish causation because she cannot show that her prescribing physician, Dr. Elsen, relied on its allegedly inadequate warnings about Reglan when he planned her treatment.[5] The record, reviewed in accord with the standards required for summary judgment, reveals a factual dispute that refutes Wyeth's contention.

---

[3] "Bioequivalence exists when there is no significant difference between the rate and extent of absorption of two drugs with the same active ingredients administered at the same molar dose under similar experimental conditions, or when a difference in the extent of absorption in such circumstances is not medically significant and certain other requirements are met." (*Foster v. American Home Products Corp.* (4th Cir. 1994) 29 F.3d 165, 169, fn. 3 (*Foster*); see 21 C.F.R. § 320.1(e) (2003).)

[4] "The PDR is an annual publication compiling product information about pharmaceuticals. The information is provided by the drug manufacturers and is approved by the F[DA]. Each year the PDR and its supplements are sent free of charge to licensed physicians in the United States and abroad. A typical entry includes the trade name and chemical name of the drug, a description of the drug, indications and contraindications for its use, warnings, adverse reactions, administration and dosage, and information on managing and adjusting the dosage of the drug." (*Morlino v. Med. Ctr. of Ocean Co.* (1996) 295 N.J.Super. 113 [684 A.2d 944, 945, fn. 1].)

[5] Because metoclopramide is a prescription drug, under the learned-intermediary doctrine Wyeth's duty to warn of risks associated with its usage runs to the physician, not the patient.

Wyeth argues it produced undisputed evidence that Dr. Elsen did not rely on its product warnings when he prescribed metoclopramide to Conte. It bases its argument on Dr. Elsen's statement in his declaration that "[a]t no time did I rely in any way on representations made in the PDR monograph, package insert, labeling materials or other information from Wyeth regarding the medication Reglan in order to formulate my course of care and treatment for Ms. Conte." Without more, we would agree that Dr. Elsen's statement would prevent Conte from proving he relied on Wyeth's alleged misrepresentations in its product information. (See *Ochoa v. Pacific Gas & Electric Co., supra,* 61 Cal.App.4th at p. 1485.)

But, there is more. Dr. Elsen's deposition testimony submitted by Conte in opposition to Wyeth's motion raises significant questions about the import of his declaration. Dr. Elsen testified in his deposition that he "probably" read Wyeth's monograph on Reglan in the PDR during his residency training; that the PDR was one of the sources he generally refers to in his clinical practice when he considers prescribing Reglan for his patients; and that he believed the information it contained was accurate.[6] Dr. Elsen also had no recollection of having prescribed Reglan for Ms. Conte, but his lack of recollection testimony is contradicted by pharmacy records and his secretary's testimony. Accordingly, there are disputed factual issues as to both the accuracy of Dr. Elsen's recollection and, even if he did not specifically refer to the PDR when he formulated Conte's treatment, whether information he had previously garnered from the PDR was a substantial factor in his decision to prescribe Reglan for her.

Wyeth relies on *Motus v. Pfizer Inc.* (C.D.Cal. 2001) 196 F.Supp.2d 984, to demonstrate that Conte cannot show causation. But that case is very different. Victor Motus committed suicide six days after his physician prescribed the

---

(*Carlin v. Superior Court* (1996) 13 Cal.4th 1104, 1116 [56 Cal.Rptr.2d 162, 920 P.2d 1347]; *Brown v. Superior Court* (1988) 44 Cal.3d 1049, 1061–1062 [245 Cal.Rptr. 412, 751 P.2d 470]; see also *Motus v. Pfizer Inc.* (*Roerig Div.*) (9th Cir. 2004) 358 F.3d 659 [applying California law].) "In the case of medical prescriptions, 'if adequate warning of potential dangers of a drug has been given to doctors, there is no duty by the drug manufacturer to [e]nsure that the warning reaches the doctor's patient for whom the drug is prescribed.' " (*Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 65 [107 Cal.Rptr. 45, 507 P.2d 653].)

[6] The testimony in full reads: "Q: All right. Can you recall if there came a point in time in your residency training when you had occasion to consult and read the P[DR] monograph about Reglan brand metoclopramide? [¶] A: I don't recall specifically reading about it in the PDR but I read about many different medications in the PDR. It was a frequently-used drug so I probably did look at the PDR during that time regarding Reglan. [¶] . . . [¶] Q: During the course of your clinical practice here in San Francisco when you would think about prescribing Reglan for your patients did you rely on the accuracy of the information that was available to you in the [PDR] concerning Reglan? [¶] A: The PDR would be one of the sources I would refer to but just one of the sources." Asked whether, if he did consult the PDR about Reglan, he would have relied on it as being accurate, Dr. Elsen responded affirmatively.

antidepressant Zoloft. His widow sued the drug manufacturer for failing to provide adequate warnings in its package insert and marketing materials that use of Zoloft could lead to an increased risk of suicidal behavior. On summary judgment, Pfizer argued that Motus's widow could not prove that inadequate warnings caused her husband's death because his physician testified *unequivocally* that he read neither the package insert nor the PDR entry for Zoloft until after Mr. Motus died. Critically, the plaintiff presented no evidence to dispute Pfizer's showing. (*Id.* at pp. 989, 996; see also *Motus v. Pfizer Inc.* (*Roerig Div.*), *supra*, 358 F.3d at pp. 660–661 [affirming summary judgment because it was undisputed that the prescribing doctor did not read the manufacturer's information before prescribing the drug].) Here, the evidence is much more equivocal. Conte produced evidence tending to show that Dr. Elsen had probably read the PDR entry for Reglan, believed it to be accurate, and generally would rely on the PDR when he considered prescribing Reglan to his patients. This evidence supports a reasonable inference that Wyeth's PDR product information was a causal factor in Dr. Elsen's decision to treat Conte with metoclopramide and raises a sufficient question of fact to defeat summary judgment on that ground.

We also are unpersuaded by Wyeth's contention that it was Conte's burden to also demonstrate that a stronger warning in the PDR would have affected Dr. Elsen's decision to prescribe the drug to her. The premise of Wyeth's causation argument was that Dr. Elsen *never read* Wyeth's disclosures, so any allegedly inadequate information they contained could not have affected his decision. Wyeth did not seek summary judgment on the ground that Elsen would have made the same treatment decision even if Wyeth had disclosed a higher risk of adverse side effects. Conte was not required to demonstrate a dispute over a factual issue not raised by Wyeth's summary judgment motion.

## B. Comparison of Fault-based and Strict Products Liability Theories

Conte readily admits that she took only generic metoclopramide, and not the name-brand Reglan that was made and distributed by Wyeth. She argues that Wyeth can be liable for her injuries because a name-brand manufacturer that disseminates information about its product owes a duty of care to ensure the information's accuracy to any doctor who prescribes the drug in reasonable reliance on that information, even if the patient ends up taking the name-brand product's generic equivalent. Wyeth argues, and the trial court agreed, that it cannot be held liable to Conte for her injuries caused by generic metoclopramide because Wyeth has no duty to users of the generic

version of its products, which are produced by other manufacturers. The issue is apparently one of first impression in California.

As a preliminary matter, we reject Wyeth's syllogism premised upon products liability doctrine that (1) this is merely a products liability lawsuit disguised as an action for fraud and misrepresentation; and (2) Conte cannot prevail on a strict products liability claim because Wyeth did not manufacture or sell the product that allegedly caused her injury; so (3) Conte loses. The conclusion would be sound were Conte in fact pursuing a cause of action against Wyeth for strict products liability. But she is not. The complaint alleges that Wyeth made intentional and/or negligent misrepresentations about the safety of metoclopramide, the risks of its long-term use, and the likelihood of its serious side effects.[7] She does not allege that Wyeth is strictly liable because inadequate warnings rendered its product unreasonably dangerous. (See, e.g., *Carlin v. Superior Court, supra*, 13 Cal.4th at p. 1113.) Rather, she charges that Wyeth failed to use due care when disseminating its product information.[8]

■ Negligence and strict products liability are separate and distinct bases for liability that do not automatically collapse into each other because the plaintiff might allege both when a product warning contributes to her injury. " '[F]ailure to warn in strict liability differs markedly from failure to warn in the negligence context. Negligence law in a failure-to-warn case requires a plaintiff to prove that a manufacturer or distributor did not warn of a particular risk for reasons which fell below the acceptable standard of care, i.e., what a reasonably prudent manufacturer would have known and warned about. Strict liability is not concerned with the standard of due care or the reasonableness of a manufacturer's conduct. The rules of strict liability require a plaintiff to prove only that the defendant did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution. Thus, in strict liability, as opposed to negligence, the reasonableness of the defendant's failure to warn is immaterial. [¶] Stated another way, a reasonably prudent manufacturer might reasonably decide that the risk of harm was such as not to require a warning

---

[7] Intentional and negligent misrepresentations are both actionable forms of fraud. (Civ. Code, § 1710.) While intentional misrepresentation requires an assertion of fact by one not believing it to be true (§ 1710, subd. 1), a statement made without a reasonable basis to believe it is true and the suppression of fact by one bound to disclose it are also actionable. (§ 1710, subds. 2–3.) For purposes of our discussion, negligent misrepresentation will subsume intentional fraud.

[8] Nor, contrary to Wyeth's suggestion, is there any indication in the record that Conte is proceeding under a market-share liability theory (see *Sindell v. Abbott Laboratories* (1980) 26 Cal.3d 588 [163 Cal.Rptr. 132, 607 P.2d 924]) on the basis of the similarities between Reglan and generic metoclopramide.

as, for example, if the manufacturer's own testing showed a result contrary to that of others in the scientific community. Such a manufacturer might escape liability under negligence principles. In contrast, under strict liability principles the manufacturer has no such leeway; the manufacturer is liable if it failed to give warning of dangers that were known to the scientific community at the time it manufactured or distributed the product.' [Citation.] Similarly, a manufacturer could not escape liability under strict liability principles merely because its failure to warn of a known or reasonably scientifically knowable risk conformed to an industry-wide practice of failing to provide warnings that constituted the standard of reasonable care." (*Carlin v. Superior Court, supra*, 13 Cal.4th at pp. 1112–1113.)

Accordingly, the trial court was correct in its assumption that "this is a case involving legal principles of negligent misrepresentation, and not a products liability action." For this reason, Wyeth's reliance on numerous strict products liability cases for the rule that a plaintiff in a products liability case must prove the defendant made or sold the allegedly defective product that causes injury sheds no light on the issue presented for our consideration. (See *Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 79–81 [86 Cal.Rptr.2d 846, 980 P.2d 398] [allegation that exposure to multiple defendants' chemicals caused cancer]; *Murphy v. E. R. Squibb & Sons, Inc.* (1985) 40 Cal.3d 672, 682 [221 Cal.Rptr. 447, 710 P.2d 247] [addressing causation element under market-share liability]; *DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666 [69 Cal.Rptr.3d 888] [plaintiff alleges fatal motorcycle accident caused by defective kickstand]; *Garcia v. Joseph Vince Co.* (1978) 84 Cal.App.3d 868, 874 [148 Cal.Rptr. 843] [nonsuit granted because plaintiff could not show which of two possible manufacturers produced the allegedly defective blade].)

Our decision today is rooted in common sense and California common law. We are not marking out new territory by recognizing that a defendant that authors and disseminates information about a product manufactured and sold by another may be liable for negligent misrepresentation where the defendant should reasonably expect others to rely on that information and the product causes injury, even though the defendant would not be liable in strict products liability because it did not manufacture or sell the product. (See *Hanberry v. Hearst Corp.* (1969) 276 Cal.App.2d 680 [81 Cal.Rptr. 519] [misrepresentation claim permitted against magazine publisher that endorsed manufacturer's product].) We perceive no logical or legal inconsistency between allowing the suit for negligence and disallowing the suit for strict products liability.

## C. Duty Analysis

We will analyze Wyeth's duty in context and consider whether a name-brand prescription drug manufacturer in disseminating product warnings owes a duty of care to patients who take a generic version of the drug pursuant to a prescription written in reliance on the name-brand maker's information. The parties cite no California authority directly on point, and our research has disclosed none. However, we do not write on a completely blank slate.

### 1. *Foreseeability*

For over 80 years, the common law has examined duty in light of the risk undertaken by the actor charged with negligence. "The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension." (*Palsgraf v. Long Island R. R. Co.* (1928) 248 N.Y. 339, 344 [162 N.E. 99]; accord, *Dillon v. Legg* (1968) 68 Cal.2d 728, 739 [69 Cal.Rptr. 72, 441 P.2d 912].)[9] In California, the general rule is that "all persons have a duty to use ordinary care to prevent others from being injured as the result of their conduct." (*Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1077 [60 Cal.Rptr.2d 263, 929 P.2d 582] (*Randi W.*); see Civ. Code, § 1714.)[10] More specifically, when our Supreme Court has considered misrepresentations that implicate a risk of physical harm to others, it has looked to the rules set forth in the Restatement Second of Torts, sections 310 and 311.[11] (*Randi W., supra,* at pp. 1075, 1081; *Garcia v. Superior Court* (1990) 50 Cal.3d 728, 734 [268 Cal.Rptr. 779, 789 P.2d 960] (*Garcia*); see also *Hanberry v. Hearst Corp., supra,* 276 Cal.App.2d at pp. 685–686 & fn. 1.)

Section 310 of the Restatement addresses intentional misrepresentations, and states that "[a]n actor who makes a misrepresentation is subject to liability to another for physical harm which results from an act done by the other or a third person in reliance upon the truth of the representation, if the actor [¶] (a) intends his statement to induce or *should realize that it is likely to induce action by the other, or a third person,* which involves an unreasonable risk of physical harm to the other, and [¶] (b) knows [¶] (i) that the

---

[9] One California court has sought to distinguish the *Palsgraf* formulation of duty in a premises liability context. (*Hassoon v. Shamieh* (2001) 89 Cal.App.4th 1191, 1196, fn. 2 [107 Cal.Rptr.2d 658].) But we do not consider that court's requirement of "heightened foreseeability" in the premises liability context to apply generally to a duty analysis, nor do we think it was necessary to distinguish the *Palsgraf* formulation in that case. (See *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 243–244 [30 Cal.Rptr.3d 145, 113 P.3d 1159] [overruling *Hassoon* on its formulation of duty analysis in premises liability cases].)

[10] The general rule as formulated in California is thus informed by both common law and civil law principles since it is formed by cases and reflected in statute. (See *Rowland v. Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561] (*Rowland*).)

[11] All further references to the Restatement are to the Restatement Second of Torts.

statement is false, or [¶] (ii) that he has not the knowledge which he professes." (Italics added.) ■ Section 311 provides that, "[o]ne who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results [¶] (a) to the other, or [¶] (b) *to such third persons as the actor should expect to be put in peril by the action taken*." (Italics added.) "In this context, 'duty' and 'reasonable reliance' are closely connected. The likelihood that one's statements about personal safety will be taken seriously is a primary factor in determining whether one has a duty to exercise care in making such statements. As the Restatement puts it, such a duty 'extends to any person who, in the course of an activity which is in furtherance of his own interests, undertakes to give information to another, and knows or should realize that the safety of the person or others may depend on the accuracy of the information.' " (*Garcia, supra*, 50 Cal.3d at p. 735, quoting Rest., § 311, com. b, p. 106.)

*Garcia* is instructive. There, the court considered whether a parole officer bore a duty of reasonable care to a parolee's prior victim when he told her the parolee would "not come looking for her" after his release. The parolee did just that and subsequently kidnapped and shot his prior victim. (*Garcia, supra*, 50 Cal.3d at pp. 731–733.) Relying on section 311 of the Restatement, the Supreme Court analyzed the parole officer's duty by "asking whether a reasonable parole officer, having chosen for whatever reason to provide information to a potential victim about a parolee's dangerousness, 'knows or should realize that [the listener's] safety . . . may depend on the accuracy of the information.' " (*Garcia, supra*, at pp. 735–736.) Because it is foreseeable that a member of the public might reasonably believe a parole officer has special knowledge or reliability, the court concluded that once the officer chose to communicate information about the parolee to the victim, he had a duty to use reasonable care in doing so. (*Id.* at p. 736.) Subsequently, in *Randi W.* the Supreme Court extended *Garcia* when it considered whether a school district's misrepresentations about a former employee in a letter of recommendation could render the school district liable for the employee's molestation of a student in his new employment. The court held that, "consistent with Restatement Second of Torts sections 310 and 311," the writer of the recommendation owed a duty not to misrepresent the relevant facts if the misrepresentations would present a foreseeable and substantial risk of harm to a third party. (*Randi W., supra*, 14 Cal.4th at pp. 1070, 1077, 1081.)

■ As in *Garcia* and *Randi W.*, in this case our duty analysis must look primarily to the foreseeability of physical harm. "Although foreseeability is most often a question of fact for the jury, when there is no room for a

reasonable difference of opinion it may be decided as a question of law." *(Hedlund v. Superior Court* (1983) 34 Cal.3d 695, 705 [194 Cal.Rptr. 805, 669 P.2d 41].) This is such a case. ■ In California, as in most states, pharmacists have long been authorized by statute to fill prescriptions for name-brand drugs with their generic equivalents unless the prescribing physician expressly forbids such a substitution. (Bus. & Prof. Code, § 4073;[12] *Inwood Laboratories v. Ives Laboratories* (1982) 456 U.S. 844, 847–848, fn. 4 [72 L.Ed.2d 606, 102 S.Ct. 2182].) It is therefore highly likely that a prescription for Reglan written in reliance on Wyeth's product information will be filled with generic metoclopramide. And, because by law the generic and name-brand versions of drugs are biologically equivalent (21 U.S.C. § 355(j)(2)(A), (B); see *Foster, supra,* 29 F.3d at p. 169), it is also eminently foreseeable that a physician might prescribe generic metoclopramide in reliance on Wyeth's representations about Reglan. In this context, we have no difficulty concluding that Wyeth should reasonably perceive that there could be injurious reliance on its product information by a patient taking generic metoclopramide.

## 2. *Other Factors That Bear on a Determination of Duty ("Rowland Factors")*

■ In addition to foreseeability, California law also identifies various policy factors courts are to consider when they determine whether a duty of care exists in a novel situation. *(Randi W., supra,* 14 Cal.4th at p. 1077; *Rowland, supra,* 69 Cal.2d at p. 112.) These *"Rowland* factors" are: the foreseeability of harm to the plaintiff; the degree of certainty that the plaintiff suffered injury; the closeness of the connection between the defendant's conduct and the plaintiff's injury; the moral blame attached to the defendant's conduct; the policy goal of preventing future harm; the burden to the defendant and consequences to the community of imposing a duty of care;

---

[12] Business and Professions Code section 4073 provides in part: "(a) A pharmacist filling a prescription order for a drug product prescribed by its trade or brand name may select another drug product with the same active chemical ingredients of the same strength, quantity, and dosage form, and of the same generic drug name as determined by the United States Adopted Names (USAN) and accepted by the federal F[DA], of those drug products having the same active chemical ingredients. [¶] (b) In no case shall a selection be made pursuant to this section if the prescriber personally indicates, either orally or in his or her own handwriting, 'Do not substitute,' or words of similar meaning. Nothing in this subdivision shall prohibit a prescriber from checking a box on a prescription marked 'Do not substitute'; provided that the prescriber personally initials the box or checkmark. . . . [¶] (c) Selection pursuant to this section is within the discretion of the pharmacist, except as provided in subdivision (b). . . . In no case shall the pharmacist select a drug product pursuant to this section unless the drug product selected costs the patient less than the prescribed drug product. . . ."

and broader consequences including the availability, cost, and prevalence of insurance for the risk involved. (*Randi W., supra,* at p. 1077.)

We are not persuaded that the application of these factors supports a departure in this case from the general rule that all persons have a duty to use ordinary care to prevent harming others.[13] (See *Randi W., supra,* 14 Cal.4th at p. 1077.) We have already addressed the issue of foreseeability in the first part of this duty analysis, so we will not belabor the point here. Suffice that a generic metoclopramide user is within Wyeth's range of apprehension of those affected by its Reglan product warning. There is no dispute that Conte suffers from tardive dyskinesia. If it is established that Dr. Elsen relied on Wyeth's product warnings when he prescribed metoclopramide and Conte's long-term use of the medication led to her condition, a close link between Wyeth's nondisclosure of its long-term effects and Conte's condition is readily apparent.

Turning to the next *Rowland* factor, we cannot assess the moral culpability of Wyeth's conduct on this record. If Wyeth intentionally, or even negligently, excluded a warning from its product information, it may be morally culpable for the resulting harm. On the other hand, it is possible that the information available to Wyeth was so scientifically unsubstantiated that it was not below the standard of care to omit any warning for the product information. While full assessment of this factor must await the outcome of trial, we think one thing is clear: that if Wyeth misrepresented the risks of taking its medication, any moral culpability it might bear for that misrepresentation is not lessened if the person who is harmed by his or her reliance on it happened to ingest the generic version as a result, rather than Wyeth's Reglan brand.

We are unpersuaded by Wyeth's assertion that imposing liability would undermine the goal of preventing future harm because it would chill innovation in the pharmaceutical industry. No evidence was introduced on summary judgment to support this supposition, much less to permit an informed balancing of such a risk against the harm to patients that might be prevented by recognizing a duty of care.

---

[13] Wyeth contends *Rowland* is inapplicable because in this case "the law has already specifically determined that no duty exists." (See *Mastro v. Petrick* (2001) 93 Cal.App.4th 83, 88, fn. 1 [112 Cal.Rptr.2d 185] [finding *Rowland* factors inapplicable in a case governed by the specific rule of nonliability for coparticipants in a sporting activity].) But the legal principle it identifies as preemptive is that "a manufacturer owes no duty to consumers injured by a competitor's product." As we have explained, we do not find this principle determinative in a suit based on allegedly actionable misrepresentations. As to Wyeth's alternative argument that *Rowland* points to a conclusion that no duty exists, its arguments are in large part based on speculation and conjecture about the relative burdens and benefits of imposing liability, with no relevant citation to supporting facts.

We are also in no position to assess whether holding that Wyeth owed a duty to Conte will subject Wyeth to "permanent and uncontrolled liability" "in perpetuity." Although Wyeth makes the argument, it appears Wyeth no longer has primary responsibility for Reglan-related claims arising after March 31, 2002.

While there is much that could and will be said in various fora about the burdens, societal consequences, cost, and insurance implications of Wyeth's potential liability, the limited record on summary judgment does not provide the information necessary to inform such a debate. These broader consequences of the duty we identify today cannot be considered on the limited facts in the record.

On the record that *is* before us, we find the conclusion inescapable that Wyeth knows or should know that a significant number of patients whose doctors rely on its product information for Reglan are likely to have generic metoclopramide prescribed or dispensed to them. "In the absence of 'overriding policy considerations . . . foreseeability of risk [is] of . . . primary importance in establishing the element of duty.' [Citations.] As a classic opinion states: 'The risk reasonably to be perceived defines the duty to be obeyed.' " (*Dillon v. Legg, supra*, 68 Cal.2d at p. 739, quoting *Palsgraf v. Long Island R. R. Co., supra*, 162 N.E. at p. 100.) As the foreseeable risk of physical harm runs to users of both name-brand and generic drugs, so too runs the duty of care, and Wyeth has not persuaded us that consideration of other factors requires a different conclusion. We hold that Wyeth's duty of care in disseminating product information extends to those patients who are injured by generic metoclopramide as a result of prescriptions written in reliance on Wyeth's product information for Reglan.

### 3. Foster v. American Home Products Corp.

In the absence of California authority directly on point, Wyeth urges us to follow law from other jurisdictions that have rejected the proposition that name-brand drug manufacturers may be liable under theories of misrepresentation for injuries resulting from the use of a generic equivalent. The seminal case principally relied upon by the trial court is *Foster, supra*, 29 F.3d 165 (see *Colacicco v. Apotex, Inc., supra*, 432 F.Supp.2d at pp. 540–541).

In *Foster*, the parents of an infant who died after ingesting generic promethazine sued Wyeth, the name-brand manufacturer of Phenergan.[14] The

---

[14] The parents also sued the generic manufacturer, but agreed to a dismissal with prejudice for reasons not stated in the record. (*Foster, supra*, 29 F.3d at p. 167.)

complaint alleged negligence, strict liability, breach of warranty and negligent misrepresentation. (*Foster, supra,* 29 F.3d at p. 167.) As here, Wyeth moved for summary judgment on all counts on the ground that it did not manufacture the drug given to the plaintiffs' child.

The federal District Court for the District of Maryland granted summary judgment in Wyeth's favor on the negligence, strict liability and breach of warranty counts. As to the plaintiffs' negligent misrepresentation theory, however, the court found it was immaterial that Wyeth did not manufacture the drug the child ingested. The trial court reasoned that Wyeth could be liable for the injury, without reference to any products liability-based theory, if (1) it made false representations about the drug's safety for treating infants; and (2) the prescribing doctor relied on those representations in prescribing generic promethazine.[15] (*Foster, supra,* 29 F.3d at pp. 167–168.) The Fourth Circuit Court of Appeals reversed. Applying Maryland law, it held the manufacturer of a name-brand prescription drug cannot be held liable under a theory of negligent misrepresentation for an injury arising from the use of a generic version of the drug. Because *Foster* appears to be the leading case on this issue, we examine its analysis in detail.

As the trial court did in this case, the *Foster* court first criticized the plaintiffs' negligent misrepresentation claim as an attempted end run around the requirements of products liability law and, specifically, the requirement that the plaintiff must prove the defendant made the injurious product. (*Foster, supra,* 29 F.3d at p. 168.) Echoing this theme, Wyeth maintains that Conte's action is an attempt to "evade . . . black-letter California law" by labeling products liability claims as causes of action for negligent and intentional misrepresentation. As we have already explained (see pt. III.B., *ante*), we do not agree that a suit based on a theory of negligent or intentional misrepresentation is governed by rules developed under the distinct doctrine of strict products liability law. Just because a products liability claim arising from an injury might lie against *other* parties (Conte concedes that no such claim lies against Wyeth) does not mean that Wyeth has no potential liability for a negligent or intentional tort.

*Foster* goes on to consider and reject the plaintiffs' argument that they can pursue a negligence claim against Wyeth based on its product labeling

---

[15] On a second motion, the court granted summary judgment for Wyeth on the ground that the plaintiffs could not show their doctor actually relied on any representations made by Wyeth. (*Foster, supra,* 29 F.3d at p. 168.) Both rulings were appealed to the circuit court, but because of its holding on duty the court did not reach the issue of the doctor's reliance on Wyeth's representations.

because, as a name-brand manufacturer, it knows that (1) generic manufacturers simply rely on and duplicate their labeling; and (2) prescriptions for the name-brand drug may be filled with the generic version. Although the court did not dispute these basic factual premises, it concluded that to impose a duty under these circumstances would "stretch the concept of foreseeability too far." (*Foster, supra*, 29 F.3d at pp. 170–171.) The Fourth Circuit's reasoning for this determination seems circular, and we will not employ it here.

*Foster* starts its analysis of duty by stating the basic principle that, as in California, foreseeability is the principal determinant of duty where the risk created is one of personal injury. (*Foster, supra*, 29 F.3d at p. 171; see *Dillon v. Legg, supra*, 68 Cal.2d at p. 739.) From there, the *Foster* court observes that the duty required for negligent misrepresentation arises when there is " 'such a relation that one party has the right to rely for information upon the other, and the other giving the information owes a duty to give it with care.' " (*Foster, supra*, at p. 171.) We agree with this formulation of the question as to whether the party who gives the information owes a duty of care to the recipient. But the *Foster* court's analysis falters in the next step. As foreseeability is the principal determinant of duty, the foreseeability of harm to consumers of the generic drug in reliance on information disseminated about the name-brand version should have some significance in considering whether a duty of care arises in these circumstances. But *Foster* does not address that point. Instead, it concludes—without further discussion—that no duty lies because "*Brandy Foster was injured by a product that Wyeth did not manufacture.*" (*Ibid.*, italics added.) But that is the very question posed—not the answer.

*Foster* also supports its holding with various policy reasons that we consider unpersuasive. It reasons it would be unfair to allow misrepresentation actions against name-brand manufacturers for injuries caused by generic drugs because name-brand makers bear the expense of developing, testing, and formulating labeling information for new medications, while generic manufacturers merely "rid[e their] coattails" by duplicating the innovator's successful drugs and labels. (*Foster, supra*, 29 F.3d at p. 170.) The trial court here agreed: "[i]t also seems unfair to hold the pioneer manufacturer liable as insurer for not only its own production but also its generic competitors, especially when the latter enjoys the full financial benefits but no risk regarding the product." But we do not.

We find the reasoning problematic. As Conte asks, what is unfair about requiring a defendant to shoulder its share of responsibility for injuries caused, at least in part, by its negligent or intentional dissemination of inaccurate information? California law is well established that concurrent

tortfeasors whose separate acts contribute to an injury are each liable (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 49, pp. 116–117), and we see nothing novel or unjust in recognizing application of the rule in the present circumstances. The circumstances certainly do not warrant creating an exception to the general rule of concurrent liability.[16]

We are also reluctant to create an exception to the general rule of duty based on the very limited "fairness" analysis permitted on the summary judgment record before us. While we have no reason to doubt that generic manufacturers do not invest the same time and expense in research and development of their products as innovators (see *Foster, supra*, 29 F.3d at p. 170), there are countervailing factors that may warrant an outcome on policy analysis that is different than *Foster*'s. For example, the innovator who brings a new drug to market enjoys unique advantages, such as the initial period of patent protection from competition, the fiscal rewards of name-brand recognition and the commensurate ability to charge a higher price for its product, even after its exclusive marketing position expires. While Wyeth predicts that holding it subject to the duty to avoid injurious misrepresentations would impose "permanent and uncontrolled liability" "in perpetuity, for all injuries allegedly caused by generic equivalents," these dire consequences are neither self-evident nor substantiated by the record. We also question the trial court's assumption in this case that a generic manufacturer has "no risk" regarding the product, a premise that *Foster* itself undermines with its holding that generic manufacturers adopt a name-brand manufacturer's warnings and representations at their own risk and are equally responsible for their accuracy. (*Foster, supra*, 29 F.3d at pp. 170–171.) In sum, we think the policy factors identified and considered in *Foster*'s analysis of the duty question tell less than the full story, and we depart from *Foster* in declining to find on the limited record before us that they warrant relieving an innovator of responsibility for injuries foreseeably caused by its negligent or intentional misrepresentations.

We are aware that in declining to follow *Foster* we depart from the majority of courts to have wrestled with this particular issue. (See *Colacicco v. Apotex, Inc., supra*, 432 F.Supp.2d at p. 540 [compilation of federal district

---

[16] We are not persuaded by the trial court's warning that allowing misrepresentation claims in these circumstances would, in effect, "hold the pioneer manufacturer liable as insurer" for its generic competitors. The liability in question here is based on reasonable and foreseeable reliance on the manufacturer's misleading written information about the risks of a drug, not on information disseminated by a generic competitor or on defects in the formulation or manufacture of the competitor's drug. For the same reason, we believe the fact that the name-brand manufacturer has no control over the *production* of the generic competitor's products is not relevant to this narrow inquiry, and we question *Foster*'s emphasis of that fact. (See *Foster, supra*, 29 F.3d at p. 170.)

court rulings following *Foster*]; *Goldych v. Eli Lilly & Co.* (N.D.N.Y., July 19, 2006, No. 5:04-CV-1477) 2006 U.S.Dist. Lexis 49616 [following *Foster* and *Colacicco*].)[17] Here, as in *Foster*, the trial court misapplied to Ms. Conte's fraud and negligent misrepresentation claims the rule that no *products liability* exists unless the defendant manufactured or sold the injurious product that causes injury. This, in our view, was erroneous. The fact that Wyeth did not manufacture or sell the metoclopramide Conte ingested does not relieve Wyeth from its general duty to use due care in disseminating product information to those it knows or should know are likely to be harmed as a result of their physician's reliance on that information. (See *Randi W., supra*, 14 Cal.4th 1066; *Garcia, supra*, 50 Cal.3d 728; *Hanberry v. Hearst Corp., supra*, 276 Cal.App.2d at p. 683.) We believe California law supports Conte's position that Wyeth owes a duty of due care to those people it should reasonably foresee are likely to ingest metoclopramide in either the name-brand or generic version when it is prescribed by their physicians in reliance on Wyeth's representations. We are also satisfied that Conte's evidence in opposition to summary judgment establishes a triable issue of material fact as to whether Dr. Elsen in fact relied on Wyeth's representations in the PDR. Accordingly, we conclude the court erred in granting summary judgment in favor of Wyeth.

## IV. *The Generic Defendants: Pliva, Teva, and Purepac*

### A. Pliva

Pliva joined Wyeth's motion on the ground that Conte could not prove any alleged inadequacy in its own labeling caused her injury, and asserted as an additional undisputed material fact that Dr. Elsen did not rely on the Pliva package insert in determining the proper treatment for Conte.[18] Although Conte opposed the joint summary judgment motions with evidence that Dr. Elsen "probably" read the Reglan PDR monograph and believed it to be accurate, her opposition was bare of any evidence (or assertion) that Dr. Elsen relied on information disseminated by Pliva. Critically, she concedes on appeal that "[n]o evidence indicates that the generic defendants disseminated any information concerning their metoclopramide products aside from price lists (distributed to pharmacists) and package inserts,

---

[17] *Goldych* relied in part on New York case law that where " 'alleged fraudulent acts are the same acts underlying the negligence and strict products liability causes of action, *there is no distinct cause of action for fraud.*' " (*Goldych v. Eli Lilly & Co., supra*, 2006 U.S.Dist. Lexis at p. *20, fn. 11.) Wyeth has not pointed this court to any parallel California law.

[18] Pliva also joined the other generic defendants in seeking summary judgment on federal preemption grounds.

distributed with wholesale shipments, as required by 21 C.F.R. § 201.100. *No evidence suggests that Dr. Elsen relied on either the price lists or the package inserts for generic metoclopramide, if and when he wrote or ordered Ms. Conte's Reglan prescriptions.*" (Italics added.)

▇▇▇ Conte's concessions preclude Pliva's liability. "There is no require-ment that a manufacturer must give a warning which could not possibly be effective in lessening the plaintiff's risk of harm." (*Rosburg v. Minnesota Mining & Mfg. Co.* (1986) 181 Cal.App.3d 726, 735 [226 Cal.Rptr. 299]; see *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 968 [67 Cal.Rptr.2d 16, 941 P.2d 1203] [plaintiff must prove alleged failure to provide adequate warning was a substantial factor in bringing about the injury]; *Motus v. Pfizer Inc.*, *supra*, 196 F.Supp.2d at pp. 991, 995–996 [no causation where doctor did not read the allegedly inadequate warnings]; *Motus v. Pfizer Inc. (Roerig Div.)*, *supra*, 358 F.3d 659 [affirming summary judgment based on lack of causation].) Conte maintains it is immaterial "whether the allegedly inad-equate warnings were relied upon; what must be proven is that adequate warnings, if relied upon, would have changed the *prescribing* decisions, and thereby prevented the injuries." We disagree. Conte correctly admits that a products liability defendant is liable for those injuries *proximately caused* by breach of its duty to communicate adequate product warnings. (See *Carlin v. Superior Court, supra*, 13 Cal.4th at p. 1110.) There can be no proximate cause where, as in this case, the prescribing physician did not read or rely upon the allegedly inadequate warnings promulgated by a defendant about a product. *Motus v. Pfizer Inc., supra*, 196 F.Supp.2d 984, illustrates precisely this point. Applying California law on causation, the district court held, and the circuit court affirmed, that because the prescribing physician testified unequivocally that he neither read the allegedly inadequate warning label nor relied on information provided by Pfizer's representatives before he pre-scribed the drug to his patient, "the adequacy of Pfizer's warnings is irrelevant to the disposition of this case."[19] (*Motus v. Pfizer Inc. (Roerig Div.)*, *supra*, 358 F.3d at p. 661; *Motus v. Pfizer Inc., supra*, 196 F.Supp.2d at pp. 996–998.) Such is the case here with respect to the generic manufacturers.

Conte argues that *Huynh v. Ingersoll-Rand* (1993) 16 Cal.App.4th 825 [20 Cal.Rptr.2d 296], supports her causation argument. We disagree. The question considered in *Huynh* was whether evidence that some of the plaintiff's coworkers could read and understand a concealed and obscurely worded product warning foreclosed a failure-to-warn products liability claim. (*Id.* at p. 833.) The court held that it made no difference that some of the plaintiff's coworkers could read the warning, because if a warning is difficult to read

---

[19] To be clear, there is no evidence in this case that Dr. Elsen relied on information provided by sales representatives for either Wyeth or the generic manufacturers.

or interpret "it is reasonably foreseeable some users will fail to appreciate its meaning even while others do." (*Id.* at pp. 833–834.) Here, there is no indication that Dr. Elsen saw, but did not understand, Pliva's label because it was poorly worded or designed.

## B. Purepac and Teva

Our resolution of summary judgment in favor of Pliva brings us to an interesting question concerning Purepac and Teva. Of the three generic defendants, only Pliva joined with Wyeth and sought summary judgment on the lack of Dr. Elsen's reliance on its warning. Teva and Purepac did not. But Conte impliedly conceded there is no evidence that Dr. Elsen relied on product information provided for generic metoclopramide by responding to the Wyeth and Pliva motions only with evidence of reliance on Wyeth's PDR monograph. Moreover, her appellate brief states explicitly: "No evidence indicates that the generic defendants disseminated any information concerning their metoclopramide products aside from price lists (distributed to pharmacies) and package inserts, distributed with wholesale shipments, as required by 21 C.F.R. § 201.100. No evidence suggests that Dr. Elsen relied on either the price lists or the package inserts for generic metoclopramide, if and when he ordered or wrote Ms. Conte's Reglan prescription." This concession leads implacably to the conclusion that Conte cannot prove that *any* of the three generic makers is responsible for her injury. Given the state of the evidence, we think it would be inappropriate to consider the federal preemption issues presented in this appeal.

It is well established that a reviewing court must affirm a grant of summary judgment if it is correct on any legal theory, as long as the parties had an adequate opportunity to address the theory in the trial court.[20] (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694 [23 Cal.Rptr.3d 915]; *California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 22 [4 Cal.Rptr.3d 785]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2007) ¶ 8.168.5a, p. 8-117 (rev. # 1, 2007).) " 'Regardless of how the trial court reached its decision, it falls to us to examine the record de novo and independently determine whether that decision is correct.' " (*Carnes v. Superior Court, supra,* at p. 694.) Because Conte's reliance on product information was put to the test by the Wyeth and Pliva motions, we cannot say that she had less than a full opportunity to address the reliance/causation theory squarely raised therein.

---

[20] We have considered briefs solicited from the parties in compliance with Code of Civil Procedure section 437c, subdivision (m)(2), which requires a reviewing court to invite supplemental briefs before affirming a summary judgment on grounds not relied upon by the trial court. (See *Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 975–976, fn. 6 [132 Cal.Rptr.2d 635].)

■ It would also be an inappropriate use of judicial resources for this court to review the propriety of the trial court's ruling on preemption. To address whether federal law preempts state tort liability against these defendants would be to perform an "idle act" because Conte concedes that she cannot show her doctor relied on representations by any of the generic manufacturers. (See, e.g., *Estate of Hoffman* (2002) 97 Cal.App.4th 1436, 1446–1447 [119 Cal.Rptr.2d 248] [declining to review trial court's order based on law that was significantly modified after the ruling]; *Rosburg v. Minnesota Mining & Mfg. Co., supra,* 181 Cal.App.3d at p. 733.) As a general rule, we will not resolve an issue that is unnecessary to disposition of an appeal, and this principle of appellate jurisprudence is honored with particular diligence where the issue is one of constitutional dimension. "Constitutional issues ordinarily will be resolved on appeal only if 'absolutely necessary' and not if the case can be decided on any other ground." (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra,* ¶¶ 8:202 to 8:204, pp. 8-130 to 8-131 (rev. # 1, 2007).)

We affirm the grant of summary judgment in favor of each of the three generic defendants.[21]

## V. *Conclusion*

■ We hold that Wyeth's common law duty to use due care in formulating its product warnings extends to patients whose doctors foreseeably rely on its product information when prescribing metoclopramide, whether the prescription is written for and/or filled with Reglan or its generic equivalent. The risk of harm to such a patient is foreseeable to Wyeth. To hold otherwise in this case would ignore the reality of the breadth and effect of Wyeth's representations in modern commerce and depart from firmly established principles of fault-based tort liability.

---

[21] We deny Pliva's request for judicial notice of an FDA proposed rule because consideration of the proposed rule is unnecessary for our resolution of the appeal. (*Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [31 Cal.Rptr.2d 358, 875 P.2d 73], overruled on another point in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276 [63 Cal.Rptr.3d 418, 163 P.3d 106].) We deny Conte's request for judicial notice of two volumes of various materials to the extent the material of which she seeks notice was (1) not presented to the trial court on summary judgment (*DiCola v. White Brothers Performance Products, Inc., supra,* 158 Cal.App.4th at p. 676); and/or (2) unnecessary to our resolution of the issues before us (*Mangini, supra,* at p. 1063).

## Disposition

The judgment in favor of Wyeth is reversed. The judgments in favor of Purepac, Pliva, and Teva are affirmed. The parties are to bear their own costs on appeal.

McGuiness, P. J., and Pollak, J., concurred.

A petition for a rehearing was denied November 26, 2008, and the petitions of both appellant and respondent Wyeth, Inc., for review by the Supreme Court were denied January 21, 2009, S169116. Baxter, J., was of the opinion that the petition of respondent Wyeth, Inc., should be granted.