29 F.3d 165
 63 USLW 2057, Prod.Liab.Rep. (CCH) P 14,041
 Craig FOSTER; Karen Foster, as parents and next friends,
Guardians and/or Administrators of the Estate of
Brandy Foster, Plaintiffs-Appellants,
v.
AMERICAN HOME PRODUCTS CORPORATION, Defendant-Appellee,
and
Barre-National Corporation, Defendant.
Craig FOSTER; Karen Foster, as parents and next friends,
Guardians and/or Administrators of the Estate of
Brandy Foster, Plaintiffs-Appellees,
v.
AMERICAN HOME PRODUCTS CORPORATION, Defendant-Appellant,
and
Barre-National Corporation, Defendant.
 Nos. 93-1627, 93-1664.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 7, 1994.
Decided July 14, 1994.
 
 ARGUED: Richard L. Duncan, Gilreath & Associates, Knoxville, TN, for appellants. Deborah Sweet Byrnes, Whiteford, Taylor & Preston, Towson, MD, for appellee. ON BRIEF: Karl J. Nelson, Whiteford, Taylor & Preston, Towson, MD, for appellee.
 Before NIEMEYER and HAMILTON, Circuit Judges, and CHAPMAN, Senior Circuit Judge.
 Affirmed by published opinion. Senior Judge CHAPMAN wrote the opinion, in which Judge NIEMEYER and Judge HAMILTON joined.
 OPINION
 CHAPMAN, Senior Circuit Judge:
 
 
 1
 American Home Products Corporation/Wyeth-Ayerst ("Wyeth") is a prescription drug manufacturer. Craig and Karen Foster brought suit against Wyeth when their daughter Brandy died after being given the generic equivalent of one of Wyeth's brand name prescription drugs. The district court granted summary judgment for Wyeth as to the Fosters' products liability counts because Wyeth did not manufacture the drug Brandy was given, but it allowed the Fosters to proceed on a negligent misrepresentation theory. It later granted Wyeth summary judgment on the negligent misrepresentation claim on the ground that the Fosters failed to show reliance.
 
 
 2
 This appeal presents two issues: whether the district court correctly held that a manufacturer of a brand name prescription drug may be held liable on a negligent misrepresentation theory for a death caused by another company's generically equivalent drug; and, if so, whether the district court correctly dismissed the Fosters' claim for failure to show reliance. We hold that a name brand manufacturer cannot be held liable on a negligent misrepresentation theory for injuries resulting from use of another manufacturer's product, and therefore do not reach the second question.
 
 I.
 
 3
 Phenergan is a brand name prescription drug manufactured and sold by Wyeth. On August 28, 1988 Dr. Martin Berger prescribed Phenergan Syrup Plain for infant twins Brandy and Bradley Foster, who were suffering from colic. The pharmacy substituted Promethazine Syrup Plain, a generic equivalent of Phenergan manufactured and sold by My-K Laboratories, Inc. The active ingredient in both Phenergan Syrup Plain and Promethazine Syrup Plain is promethazine hydrochloride.
 
 
 4
 The Foster twins were given the generic promethazine several times over the next few days, last on the night of September 10, 1988. The following morning, six-week-old Brandy was found dead in her crib. The autopsy report attributed Brandy's death to Sudden Infant Death Syndrome ("SIDS"). A pediatrician from the Maryland SIDS Center at the University of Maryland opined that Brandy's death was caused by the promethazine.
 
 
 5
 The Fosters brought suit in state court against Wyeth and Barre-National Corporation. At that time the Fosters thought Barre-National had manufactured the generic promethazine Brandy was given. Wyeth removed the case to federal court on grounds of diversity of citizenship, and the district court granted Barre-National summary judgment when it was determined that My-K Laboratories manufactured the generic promethazine Brandy took. The Fosters then brought suit against My-K, but agreed to a dismissal with prejudice for reasons not stated in the record.
 
 
 6
 The Fosters' complaint against Wyeth contained four counts: Negligence--Wrongful Death, Negligence--Survivorship, Strict Liability, and Breach of Warranty. Wyeth moved for summary judgment on all counts, arguing that it could not be liable for Brandy's death because it did not manufacture the promethazine Brandy ingested.
 
 
 7
 At the summary judgment hearing, the Fosters argued that their complaint also sounded in negligent misrepresentation, and the district court agreed.[1] The district court then granted Wyeth summary judgment on the negligence, strict liability and breach of warranty counts because Wyeth did not manufacture the promethazine at issue, however, it allowed the negligent misrepresentation claim to stand. The district court stated that it was assuming for summary judgment purposes that Wyeth was promoting the use of promethazine in general, as opposed to only its own product, Phenergan. It further stated that:
 
 
 8
 if Defendant Wyeth made a false representation concerning the safety of promethazine hydrochloride for use in infants and Dr. Berger relied on the representation in prescribing a promethazine hydrochloride-based product for Brandy Foster, then Wyeth may be liable for any harm caused to Brandy as a result of the ingestion of promethazine hydrochloride, even if the drug ingested was not Wyeth's product.
 
 
 9
 J.A. 68. It considered the negligent misrepresentation claim to be distinct from the Fosters' products liability claims and therefore unaffected by the fact that Wyeth did not manufacture the product alleged to have caused the injury.
 
 
 10
 Wyeth then filed a motion for summary judgment on the negligent misrepresentation claim, arguing that the Fosters had not shown reasonable reliance. With its motion Wyeth filed an affidavit signed by Dr. Berger stating that he prescribed Phenergan for Brandy based only on his own experience with the drug and did not rely on any representations made by Wyeth. The district court granted Wyeth's motion for summary judgment on the ground that the Fosters had not shown that Dr. Berger relied on representations made by Wyeth in his decision to prescribe Phenergan for Brandy and Bradley.
 
 
 11
 The Fosters now appeal the district court's dismissal of their negligent misrepresentation claim, and Wyeth cross-appeals the district court's initial determination that Wyeth could be held liable on a negligent misrepresentation theory for injuries caused by another manufacturer's product.
 
 II.
 
 12
 We review the district court's decision granting summary judgment de novo. Moore v. Winebrenner, 927 F.2d 1312, 1313 (4th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 97, 116 L.Ed.2d 68 (1991).
 
 A.
 
 13
 Although there is no recognized cause of action based on negligent misrepresentation against one manufacturer for injuries stemming from use of another manufacturer's product, the district court allowed the Fosters' negligent misrepresentation action to proceed because he viewed it as distinct from the Fosters' products liability claims. We are unable to see any validity in this distinction. Although actions for negligent misrepresentation arise in many contexts other than products liability, in this case the allegations of negligent misrepresentation are an effort to recover for injuries caused by a product without meeting the requirements the law imposes in products liability actions. Maryland law requires a plaintiff seeking to recover for an injury by a product to demonstrate that the defendant manufactured the product at issue. See Tidler v. Eli Lilly & Co., 851 F.2d 418, 424 (D.C.Cir.1988) (federal court applying Maryland law refused to adopt non-identification theories of product liability because such theories had not been recognized by Maryland courts); Lohrmann v. Pittsburgh Corning Corp., 782 F.2d 1156, 1163-64 (4th Cir.1986) (verdict in favor of asbestos manufacturers affirmed when plaintiff did not demonstrate exposure to defendants' products); Jensen v. American Motors Corp., 50 Md.App. 226, 437 A.2d 242, 247 (Md.Ct.Spec.App.1981) ("Regardless of the recovery theory, the plaintiff in product litigation must satisfy three basics from an evidentiary standpoint: (1) the existence of a defect; (2) the attribution of the defect to the seller; and (3) a causal relation between the defect and the injury."). The Fosters are attempting to hold Wyeth liable for injuries caused by another manufacturer's product, and we are persuaded that the Maryland courts would reject this effort to circumvent the necessity that a defendant be shown to have manufactured the product that caused an injury prior to being held liable for such injury.
 
 B.
 
 14
 The Fosters insist, however, that the fact that Wyeth did not manufacture the promethazine should not shield Wyeth from an action for negligent misrepresentation. This argument, as well as the district court's assumption that Wyeth's representations regarding Phenergan encompassed other manufacturers' promethazine products, appears to stem from certain practices of the generic drug industry and from the federal regulatory scheme governing generic drug manufacturing and sales, which we now briefly examine.[2]
 
 
 15
 The Food, Drug and Cosmetics Act requires that manufacturers obtain regulatory approval for drugs prior to marketing them. 21 U.S.C.A. Sec. 355(a) (West Supp.1994). For drugs that have never before been marketed, the approval process requires submission of a new drug application ("NDA"), which in turn mandates costly and time-consuming studies of the drug's safety and effectiveness. See 21 U.S.C.A. Sec. 355(b)(1) (West Supp.1994). As a result of the Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98-417, 98 Stat. 1585, generic drugs can now gain approval pursuant to an abbreviated new drug application ("ANDA"), which permits the applicant to provide data demonstrating that the generic drug is the same as a previously approved drug in terms of its suggested usage, active ingredients, method of administration, dosage, strength, and bioequivalence[3] in lieu of the studies necessary for an initial NDA. 21 U.S.C.A. Sec. 355(j)(2)(A) (West Supp.1994). Thus, a manufacturer is not required to perform safety and effectiveness studies if it can prove its drug is equivalent to a previously approved drug for which such testing has already been performed. The generic manufacturer must use the same labeling as the previously approved equivalent drug. 21 U.S.C.A. Sec. 355(j)(2)(A)(v) (West Supp.1994). However, manufacturers of generic drugs approved pursuant to ADNAs may alter a drug's labeling "[t]o add or strengthen a contraindication, warning, precaution or adverse reaction" or "[t]o delete false, misleading or unsupported indications for use or claims for effectiveness" without prior FDA approval. 21 C.F.R. Secs. 314.70(c)(2), 314.97 (1993).
 
 
 16
 For economic reasons, generic manufacturers accept without question the studies performed by name brand manufacturers and simply copy verbatim the name brand drugs' package circulars. Although generic manufacturers do not advertise, they still are able to generate sales, as pharmacists often substitute generic drugs for name brand prescriptions because the generics cost less. Unless a physician affirmatively indicates that a prescription is to be dispensed as written, the pharmacist may substitute a lower priced generic equivalent for the name brand drug actually prescribed. Md. Health Occ.Code Ann. Sec. 12-508 (Michie Supp.1993).
 
 
 17
 The Fosters argue that because generic drugs are required by federal law to be equivalent to their name brand counterparts, any representations Wyeth makes when advertising Phenergan also apply to generic promethazine, and name brand manufacturers, such as Wyeth, know that generic manufacturers rely on their studies and duplicate their labeling, and that if the name brand manufacturer does not issue a warning, it will simply not be made. Wyeth is also aware that when Phenergan is prescribed, the patient may actually receive generic promethazine.
 
 
 18
 The Fosters make two assertions regarding this scenario. First, a plaintiff will be unable to recover from the generic manufacturer on a negligent misrepresentation theory because the generic manufacturer did not formulate any of the representations it made regarding its product, but simply duplicated the name brand manufacturer's representations regarding the name brand drug. Second, if a doctor prescribes Phenergan in reliance on misrepresentations made by Wyeth, and generic promethazine is substituted and causes injury to the patient, Wyeth should be held responsible because such a result was entirely foreseeable to Wyeth.
 
 
 19
 We do not accept the assertion that a generic manufacturer is not responsible for negligent misrepresentations on its product labels if it did not initially formulate the warnings and representations itself. When a generic manufacturer adopts a name brand manufacturer's warnings and representations without independent investigation, it does so at the risk that such warnings and representations may be flawed. In cases involving products alleged to be defective due to inadequate warnings, "the manufacturer is held to the knowledge and skill of an expert.... The manufacturer's status as expert means that at a minimum he must keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby." Owens-Illinois v. Zenobia, 325 Md. 420, 601 A.2d 633, 639 (Md.1992) (quoting Borel v. Fibreboard Paper Prods. Corp., 493 F.2d 1076, 1098 (5th Cir.1973), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974)). The same principle applies in the instant case; as an expert, a manufacturer of generic products is responsible for the accuracy of labels placed on its products. Although generic manufacturers must include the same labeling information as the equivalent name brand drug, they are also permitted to add or strengthen warnings and delete misleading statements on labels, even without prior FDA approval. 21 C.F.R.Sec. 314.70 (1993). The statutory scheme governing premarketing approval for drugs simply does not evidence Congressional intent to insulate generic drug manufacturers from liability for misrepresentations made regarding their products, or to otherwise alter state products liability law. Manufacturers of generic drugs, like all other manufacturers, are responsible for the representations they make regarding their products.
 
 
 20
 We also reject the contention that a name brand manufacturer's statements regarding its drug can serve as the basis for liability for injuries caused by another manufacturer's drug. Name brand manufacturers undertake the expense of developing pioneer drugs, performing the studies necessary to obtain premarketing approval, and formulating labeling information. Generic manufacturers avoid these expenses by duplicating successful pioneer drugs and their labels. Name brand advertising benefits generic competitors because generics are generally sold as substitutes for name brand drugs, so the more a name brand drug is prescribed, the more potential sales exist for its generic equivalents. There is no legal precedent for using a name brand manufacturer's statements about its own product as a basis for liability for injuries caused by other manufacturers' products, over whose production the name brand manufacturer had no control. This would be especially unfair when, as here, the generic manufacturer reaps the benefits of the name brand manufacturer's statements by copying its labels and riding on the coattails of its advertising. The premarketing approval scheme Congress established for generic equivalents of previously approved drugs cannot be construed to create liability of a name brand manufacturer when another manufacturer's drug has been consumed.
 
 
 21
 The Fosters offer no case in which one manufacturer has been held liable on a negligent misrepresentation theory for injuries caused by another manufacturer. They contend, however, that Village of Cross Keys v. U.S. Gypsum Co., 315 Md. 741, 556 A.2d 1126 (Md.1989), supports their theory of liability. In Cross Keys, architects designed a "curtain wall" system for a building based on specifications contained in a U.S. Gypsum sales publication. Id. 556 A.2d at 1129. The specifications required U.S. Gypsum materials, some of which had unique designs specially suited for curtain wall systems. Id. at 1130. The architects' design varied somewhat from the U.S. Gypsum specifications and did not use the unique U.S. Gypsum products. Id. When the curtain wall system leaked, the architects sued U.S. Gypsum claiming they relied on U.S. Gypsum's design and the design was faulty. Id. at 1127. The Maryland Court of Appeals held that the architects could not recover against U.S. Gypsum for negligent misrepresentation because they had not adhered to the U.S. Gypsum specifications, including the use of U.S. Gypsum products, and therefore could not show reasonable reliance on the publication. Id. at 1135. Alternatively, U.S. Gypsum had no duty to the architects because they had not adhered to the U.S. Gypsum specifications and therefore had not used the U.S. Gypsum system. Id.
 
 
 22
 The language on which the Fosters rely pertains to U.S. Gypsum's argument that it did not have a sufficient nexus with the architects to result in liability because it did not deal directly with the architects. Id. at 1134. The court specifically declined to determine the validity of this argument, but expressed strong doubts regarding it, because the architects were part of the publication's intended and foreseeable audience and the purpose of the publication was to generate profits through the sale of U.S. Gypsum products. Id.
 
 
 23
 Cross Keys is distinguishable from the instant case, as the architects in Cross Keys used U.S. Gypsum's plan but failed to follow its specifications, while the Fosters did not use Wyeth's product at all, and the language on which the Fosters rely is dicta.
 
 
 24
 In sum, the Fosters offer no authority for their assertion that one manufacturer can be held liable for injuries stemming from another manufacturer's product, and demonstrate no basis in the federal drug approval scheme for treating drug manufacturers differently from other manufacturers in products liability actions.
 
 C.
 
 25
 The Fosters' negligent misrepresentation action against Wyeth also fails because Wyeth is under no duty of care to the Fosters. The elements of the tort of negligent misrepresentation under Maryland law are:
 
 
 26
 1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;
 
 
 27
 2) the defendant intends that his statement will be acted on by the plaintiff;
 
 
 28
 3) the defendant has knowledge that the plaintiff will probably rely on the statement which, if erroneous, will cause loss or injury;
 
 
 29
 4) the plaintiff, justifiably, takes action in reliance on the statement; and
 
 
 30
 5) the plaintiff suffers damage proximately caused by the defendant's negligence.
 
 
 31
 Martens Chevrolet v. Seney, 292 Md. 328, 439 A.2d 534, 539 (Md.1982) (emphasis supplied). An action for negligent misrepresentation will not lie unless the defendant owes the plaintiff a duty of care. Weisman v. Connors, 312 Md. 428, 540 A.2d 783, 790-92 (Md.1988).
 
 
 32
 The Fosters contend that a duty exists in this case because it was foreseeable to Wyeth that misrepresentations regarding Phenergan could result in personal injury to users of Phenergan's generic equivalents. They point to Jacques v. First National Bank, a negligence action, which noted:
 
 
 33
 Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability.
 
 
 34
 307 Md. 527, 515 A.2d 756, 759-60 (Md.1986). We think to impose a duty in the circumstances of this case would be to stretch the concept of foreseeability too far. The duty required for the tort of negligent misrepresentation arises when there is "such a relation that one party has the right to rely for information upon the other, and the other giving the information owes a duty to give it with care." Weisman v. Connors, 312 Md. 428, 540 A.2d at 790 (quoting Holt v. Kolker, 189 Md. 636, 57 A.2d 287, 288 (1948)). There is no such relationship between the parties to this case, as Brandy Foster was injured by a product that Wyeth did not manufacture. As Wyeth has no duty to the users of other manufacturers' products, a negligent misrepresentation action cannot be maintained against it on the facts of this case.
 
 III.
 
 35
 As a federal court sitting in diversity, we must apply the applicable state law as it now exists. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); Tritle v. Crown Airways, Inc., 928 F.2d 81, 84 (4th Cir.1990). Under current Maryland law, we find no basis for a negligent misrepresentation action on the facts of this case and hold that the negligent misrepresentation claim should have been disposed of along with the Fosters' other products liability claims. Therefore, it is unnecessary to consider whether the district court properly dismissed that claim for failing to demonstrate that Dr. Berger relied on representations of Wyeth in prescribing Phenergan for Brandy Foster. We affirm the district court's grant of summary judgment to Wyeth, but on the ground that Maryland law does not recognize a cause of action for negligent misrepresentation against one manufacturer for injuries caused by another manufacturer's product.
 
 AFFIRMED
 
 
 [1]
 Although we have some question whether the Fosters' complaint actually alleged negligent misrepresentation, as there was no such count and the complaint does not mention the term "negligent misrepresentation," we address this appeal on the assumption that it did because the district court so found
 
 
 [2]
 The following description oversimplifies the federal statutory and regulatory scheme for drug premarketing approval, but is sufficient for purposes of the current discussion
 
 
 [3]
 Bioequivalence exists when there is no significant difference between the rate and extent of absorption of two drugs with the same active ingredients administered at the same molar dose under similar experimental conditions, or when a difference in the extent of absorption in such circumstances is not medically significant and certain other requirements are met. 21 U.S.C.A. Sec. 355(j)(7)(B) (West Supp.1994)